| | |
|---|---|
| LAURA CONROY<br><br>Plaintiff,<br><br>v.<br><br>MIKE JOHANNS, *Secretary of Agriculture,*<br>*United States Department of Agriculture*<br><br>Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:06-CV-867-CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Before the court is Laura Conroy's action against the United States Department of

Agriculture for gender and age discrimination stemming from her non-selection for the INFRA

Program Manager with the Forest Service (the "Agency") in 2001. Ms. Conroy also claims that

the Agency discriminated and retaliated against her for submitting an EEO action following her

2001 non-selection by relisting the 2004 position in such a way that would disqualify her from

consideration. Defendant has moved for summary judgment, and has shown that there is no

genuine issue of material fact. The court finds that Ms. Conroy has failed to carry her burden in

both demonstrating that Defendant's legitimate reasons for her non-selection were pre-textual, and

in showing causation to meet the prima facie case for retaliation. Defendant's motion for

summary judgment is therefore granted. In coming to this decision, the court also finds that Dr.

Nancy Dodd's testimony should be excluded because she is unqualified to proffer testimony

relating to gender stereotyping. The court likewise excludes Mr. Paul Katz's testimony relating to

the reasoning or causes of the 2004 relisting having found it unreliable.

## BACKGROUND

From 1993 to 2001, Ms. Conroy performed the duties of an Infrastructure (INFRA) Coordinator in Region 4 of the Forest Service, an agency of the USDA.[1]  In 2001, the Forest Service advertised the coordinator position as a new position called INFRA Program Manager. The advertisement was listed in both the administrative (no degree required) and professional series (degree required).[2]  Ms. Conroy applied for the Program Manager position and was found to be a qualified candidate.[3]

Due to an insufficient applicant pool, the position was re-posted with lowered qualifications as had been regularly done.[4]  Ms. Conroy reaffirmed her interest for the position, but Dan Hager was ultimately hired for the position.[5]  Ms. Conroy argues that under the original advertisement Mr. Hager would not have qualified for the position, and that she was ultimately more qualified.[6]  She argues that the Agency hired Mr. Hager using an inconsistent and subjective evaluation process, which was used to discriminate against her on account of her age and gender.[7] As evidence of this subjective process, Ms. Conroy asserts that her references were never contacted and that she was never interviewed for the position.[8]  Accordingly, Ms. Conroy filed her first EEOC complaint in 2002.[9]

In February of 2004, the Forest Service again announced an opening for the INFRA Program Manager position.  Instead of listing the position in the professional and administrative series, the position was listed only in the professional series despite the fact that the 2004 position

---

[1] (Am. Compl., ¶¶ 11-13) (Dkt. No. 3).
[2] (Am. Compl., ¶ 15).
[3] (Am. Compl., ¶ 17).
[4] Decl. of Larry Larson, ¶ 17 (Dkt. No. 76-2).
[5] (Am. Compl., ¶¶ 21-22).
[6] (Am. Compl., ¶¶ 22-25).
[7] (Am. Compl., ¶¶ 25-26).
[8] (Am. Compl., ¶¶ 18-19).
[9] (Am. Compl., ¶ 7).

was substantially the same as before.[10]  This resulted in Ms. Conroy being deemed unqualified for the position because she lacked the necessary degree required under the professional series, and because the Forest Service refused to acknowledge her nine years of experience as being an adequate substitute.[11]  As such, Ms. Conroy was passed-over for another candidate, Ms. Andrea Gehrke.[12]

Ms. Conroy subsequently filed a second Complaint of Discrimination with the USDA on June 29, 2004, alleging gender-based discrimination and retaliation for having filed the first complaint.[13]  Ms. Conroy's original action brought in this District Court was brought on behalf of herself and "others similarly situated against Defendant for discrimination in employment and promotion by Defendant based on gender, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*"[14]  The class claims were dismissed by Judge Cassel in June of 2007.[15]  The remaining questions before the court are Defendant's motions to exclude testimony, and motion for summary judgment on Ms. Conroy's remaining claims.

## DEFENDANT'S MOTIONS TO EXCLUDE

### I.      DR. DODD'S TESTIMONY

Because Ms. Conroy's heavy reliance on Dr. Dodd's testimony, the court first considers Defendant's motion to exclude Dr. Dodd's testimony.  To determine whether an expert opinion is admissible, the court must perform a two-step analysis:  "First, the court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion.

---

[10] (Am. Compl.., ¶¶ 29-30, 32).
[11] (Am. Compl., ¶¶ 37-40.)
[12] Decl. of Stephen Solem, ¶ 14 (Dkt. No. 76-2).
[13] (Am. Compl., ¶ 7).
[14] (Am. Compl., ¶ 1).
[15] June 22, 2007 Order, 17 (Dkt. No. 37).  By way of noting this court's consideration of jurisdictional issues, the Supreme Court has held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  Accordingly, the court considers any time-barring issues previously brought by Defendant but dismissed without prejudice, waived.  The court will therefore reach the decision on the merits of Ms. Conroy's discrimination claim.

Second . . . the court must determine whether the expert's opinion is reliable under . . . *Daubert*."[16] To qualify as an expert, the individual must "possess such skill, experience or knowledge in that particular field as to make it appear that [her] opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."[17] Because the court finds that Dr. Dodd is unqualified to proffer testimony relating to gender stereotyping, an analysis of the second factor is moot.

Defendant argues the Dr. Dodd's testimony should be excluded because she is unqualified to offer an expert opinion regarding gender stereotyping, and generally asserts that her testimony is not within the area of her expertise.[18] Specifically, Defendant argues that (1) she has admittedly never researched or written about sex stereotypes; (2) she became familiar with sex stereotyping literature only after being retained for this case; (3) she could not recall articles or relevant cases supporting the application of sex stereotyping research in the context of a single plaintiff disparate treatment claim; and (4) her qualifications on the subject are lacking compared with others found qualified to opine on the topic of gender stereotyping.[19]

Because Ms. Conroy does nothing to directly rebut Defendant's specific challenges, the court therefore considers them conceded. As such, the critical question becomes whether sex stereotyping is "within the reasonable confines" of Dr. Dodd's subject area.[20] Ms. Conroy, makes no argument to support this contention, but only proffers a conclusory statement that "[g]iven [Dr. Dodd's] extensive experience consulting in the areas of discrimination and wrongful termination cases, as well as selection process, sex stereotyping and its influence in the INFRA Program

---

[16] *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (internal citations omitted).
[17] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (internal citations omitted).
[18] (Def.'s Rep. Mem. in Supp. Mot. to Exclude, 4) (Dkt. No. 124).
[19] (Def.'s Rep. Mem. in Supp. Mot. to Exclude, 5-6).
[20] *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001).

Manager selection process is clearly within the reasonable confines of her experience."[21]  Ms. Conroy lists Dr. Dodd's various accomplishments and notes that "[s]ince 1990 [Dr. Dodd] has engaged in expert opinion work for both plaintiffs and defendants in age discrimination, sexual harassment and wrongful termination cases [and] has served as an expert witness in at least fifteen cases since 1991."[22]  None of this information, however, demonstrates that gender stereotyping is "within the reasonable confines" of Dr. Dodd's expertise.

Indeed, if gender stereotyping were part of Dr. Dodd's subject area, the court would expect to find *some* indication that Dr. Dodd had either researched, opined, or written about gender stereotyping in the past.  Additionally, testimony could have been proffered evidencing the number of instances the issue has arisen before in her previous work, or the relatedness of gender stereotyping within general discriminatory research.  Nothing of the sort was presented.  Although it is possible that such a connection could be made, the court will not connect the proverbial dots for the parties.  Accordingly, any testimony of Dr. Dodd regarding sex stereotypes is excluded.[23]

## II.     MR. KATZ'S TESTIMONY

The Government also moves to exclude the testimony of Mr. Katz.  The Tenth Circuit has stated that "a witness relying solely or primarily on experience must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how the experience is reliably applied to the facts."[24]  Relevant to the motion for summary judgment, Mr. Katz states it was his opinion that under the second listing, candidates were required "to have

---

[21] (Pl.'s Mem. Opp'n to Mot. Exclude, 7) (Dkt. No. 121).

[22] (Pl.'s Mem. Opp'n to Mot. Exclude, 6-7).

[23] Although the court does not thoroughly analyze the second prong of reliability, it is evident that it alone would face significant problems even if the court found that Dr. Dodd was qualified under the first.  For purposes of this decision, the court also notes that it will also not consider any argument insofar as Ms. Conroy cites to Dr. Dodd's characterization of affidavits, declarations, or other evidence in the record as impermissible hearsay.

[24] *United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003) (internal citations omitted).

a formal scientific college education . . . even though nothing had really changed."[25] Mr. Katz's statement, however, demonstrates a lack of knowledge regarding what in the Agency's view had changed with regards to the position, the stated reasons by Agency representatives for their decision, an evaluation of those reasons, what the Agency rules were regarding listing positions as "interchangeable," and how similar positions had been listed.

Furthermore, the only documents considered by Mr. Katz, as listed in his statement, were the announcement and position descriptions, two policy documents, and five documents relating to Ms. Conroy. Per his own statement, Mr. Katz considered none of the affidavits by various individuals capable of offering an explanation of the Agency's actions. As such, Mr. Katz's testimony ultimately fails to provide a meaningful analysis of how he came to conclude what he did while showing that his testimony reliably applied the facts of this case. The court cannot rely upon his bold *ipse dixit*.[26] Accordingly, testimony presented by Mr. Katz that relates to the reasoning or causes of the 2004 relisting is excluded.

## STANDARD FOR SUMMARY JUDGMENT

Defendants' motion for summary judgment will be granted, only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[27] "A 'material fact' is one which could have an impact on the outcome of the lawsuit, while a 'genuine issue' of such a material fact exists if a rational jury could find in favor of the non-moving party based on the evidence presented."[28] In moving for summary judgment, "[t]he movant has the burden of showing that there is no genuine issue of fact;" however, "the

---

[25] Statement of Paul A. Katz, 4 (Feb. 9, 2009) (Dkt. No. 105-26, Ex. Z).
[26] *United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) ("The trial court's gatekeeping function requires more than simply taking the expert's word for it. Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (internal citations omitted).
[27] Fed. R. Civ. P. 56(a).
[28] *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000).

plaintiff is not thereby relieved of his own burden of producing . . . evidence that would support a jury verdict."[29]  Likewise, the role of the Court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial."[30]

## **DISCUSSION**

### **III.  MS. CONROY'S 2001 DISCRIMINATION CLAIM**

#### **A.  Discrimination Standard**

To establish a claim based on discriminatory treatment, the Supreme Court has required: (1) the plaintiff to prove by preponderance of the evidence a prima facie case of discrimination; (2) if the plaintiff is successful, the defendant then is required to articulate some legitimate, nondiscriminatory reason for the employee's rejection; (3) if the defendant is successful, then the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[31]

First, and as Ms. Conroy points out, the Government does not dispute that a prima facie case has been raised.[32]  The court, therefore, considers this prong met.  Second, the Government has argued that "the most important qualifications for the position were associated with leadership and program management, as well as the knowledge and experience necessary to be able to coordinate and communicate successfully with officials from the many different disciplines of the Forest Service . . . and because most of the technical work was being handled by the Washington Office, technical skill was deemed less critical."[33]  The Government therefore concluded that

---

[29] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).
[30] *Id.* at 249.
[31] *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).
[32] (Pl.'s Mem. Opp'n to Mot. for Summ. J., 1) (Dkt. No. 105).
[33] (Def.'s Mem. Supp. of Mot. for Summ. J., 28) (Dkt. No. 76).

   The importance of these qualifications and the reasons for the Agency to require them for the 2001 position need not be fully discussed here.  The reasons are well-articulated by Defendant.  *See id.*, 6-11, ¶¶ 16-37.  Let it suffice to say that the INFRA system was created due to pressure on the Agency to remedy its failings in the auditing process because it could not account for its real property assets.  Because of inherent problems and inefficiencies with the management of the INFRA system, the INFRA Program Manger position was created to, in part, also gain the

although Ms. Conroy was one of the top three candidates based on their written application, "Mr. Hager's strong program management experience at all levels of the Forest Service made him a superior candidate overall."[34]  Such a reason appears both legitimate and nondiscriminatory.[35]  Thus, the burden now shifts to Ms. Conroy to show that these reasons were but a pretext for discrimination.  This is the critical issue before the court.

## B.  The Pre-textual Analysis

"To raise an inference of pretext in the face of the employer's legitimate, non-discriminatory explanation, the plaintiff must undermine the employer's credibility to the point that a reasonable jury could not find in its favor."[36]  As such, Ms. Conroy cannot simply show pretext by "identifying minor differences between plaintiff's qualifications and those of successful applicants but only by demonstrating an overwhelming merit disparity."[37]  Ms. Conroy may establish pretext "by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

---

cooperation of officials that had considered the INFRA database to be too onerous or irrelevant to their core responsibilities.  As such, the position had changed considerably in its focus.

The court notes Ms. Conroy's objections to ¶¶ 25, 30, 31, 35.  Although most of these do not relate to the reasoning behind the Agency's classification and hiring criteria – which the court accepts having not been challenged by Ms. Conroy and therefore finds them to be legitimate – a brief response to Ms. Conroy's objections to ¶¶ 35 and 36 seems appropriate.  In essence, Ms. Conroy disputes Defendant's representation of the necessary qualifications for the 2001 position.  Ms. Conroy attempts to point out inconsistencies in the various testimonies because of the varying focus on different attributes; i.e. the need for a candidate to use data more effectively; the need for leadership and guidance, as well as communication; the weight of the various factors, etc.  (Pl.'s Mem. Opp'n to Mot. for Summ. J., xi).  However, none of these create any sort of reasonable doubt that the Agency's goals – and the qualifications need in this position to meet those goals – was anything but legitimate.  Indeed, different emphasis may have been given by the various evaluators, but such irregularities were incident to remedying an Agency concern that was far beyond and completely removed from Ms. Conroy.

[34] (Def.'s Mem. Supp. of Mot. for Summ. J., 29–30).

[35] Ms. Conroy argues that the Agency did not have, nor offer, a legitimate reason for reducing the qualifications and re-advertising the position.  (Pl.'s Mem. Opp'n to Mot. for Summ. J., 4).  This argument finds some semblance in the law, but is an erroneous construal.  The case law requires the Agency to offer a legitimate and non-discriminatory reason for Ms. Conroy's rejection.  *See Burdine*, 450 U.S. at 252-53 n.27.  This is broader and more easily met than requiring an individualized analysis of every step taken throughout the process, such as reducing the qualification or re-advertising the position.

[36] *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1310 (10th Cir. 2005).

[37] *Santana v. Denver*, 488 F.3d 860, 865 (10th Cir. 2007) ("We will draw an inference of pretext where the facts assure us that the plaintiff is better qualified than the other candidates for the position.  We have cautioned that pretext cannot be shown simply by identifying minor difference between plaintiff's qualifications and those of successful applicants, but only by demonstrating an overwhelming merit disparity.") (internal citations omitted).

factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[38]  That being said, "mere conjecture that an employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."[39]  It is also worth noting that pretext is determined by the court's examination of "the facts as they appear to the person making the decision . . . ."[40]

### 1.  Inconsistencies in the Agency's Hiring Process

Ms. Conroy bases her claim on two arguments, the first being that the Agency was inconsistent in proffering its legitimate reasons.[41]  Ms. Conroy asserts that after she applied for the position in the spring of 2001, she was not selected despite qualifying for the position as listed in the initial advertisement.[42]  Rather, she alleges that the Agency reduced the level of technical expertise required for the position and re-advertised it in an effort to discriminate against her.[43]  As a result of this re-advertisement, Mr. Hager applied and was hired.[44]  Ms. Conroy asserts that Mr. Hager did not qualify for the position under the initial advertisement, and that the Agency hired him without providing Ms. Conroy with an interview.[45]

Ms. Conroy's legal argument is premised on the notion that "courts have held that changing job requirements to disadvantage a plaintiff is circumstantial evidence of pretext."[46]  The court does not need to go into a full analysis of this statement because it misses the critical issue. It is Ms. Conroy's burden to demonstrate that the changing job requirements were but pretext in order to "disadvantage a plaintiff," as opposed to being a reevaluation of the needs of the Agency, an attempt to better define the necessary requisites for the position, or an action to simply garner a

---

[38] *Id.* at 864-65 (internal citations omitted).
[39] *Id.* (internal citations omitted).
[40] *Id.* at 865 (internal citations omitted).
[41] *See* (Pl.'s Mem. Opp'n to Mot. for Summ. J., 2–3) (Dkt. No. 105).
[42] *Id.* at 4.
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*

greater applicant pool.[47]  This is precisely what is argued by Defendant and what the evidence supports.  Ms. Conroy presents nothing that may bring such material fact into dispute other than her bald assertions to the contrary.[48]  Indeed, the evidence before the court illustrates that a reevaluation of hiring criteria was a consistent practice for the Agency and nothing suggests that the practice was done to harm Ms. Conroy or intentionally discriminate against her.

It is worth noting in coming to this decision that Ms. Conroy's use of the case law is unhelpful because of several important distinctions.  In *Bergene v. Salt River Project Agricultural Improvement & Power Dist.*, the Ninth Circuit certainly considered whether criteria were changed to eliminate the plaintiff's competitive advantage.[49]  The court did so, however, only in context of other evidence, which demonstrated that the plaintiff had previously been singled out because of her gender.[50]  Moreover, the *Bergene* opinion offers no indication that the defendant asserted legitimate reasons for reposting the employment opening as stated by the Government.  In the end, the court looked at "the aggregate" of "specific and substantial evidence" to determine whether the employment decisions were "motivated by discriminatory animus."[51]  In following the Ninth Circuit's approach toward looking at the aggregate of discriminatory conduct, the court cannot hold in favor of Ms. Conroy.

Ms. Conroy also relies upon *Goden v. Runyon*, a case from the Middle District of Tenessee; however, the facts are quite dissimilar to this case.[52]  For instance, the management in *Goden* had specifically hoped to promote a particular individual without competition and changed the job requirements against regulations to fit the individual's strengths.[53]  Additionally, not only

---

[47] *See Jaramillo*, 427 F.3d at 1310.
[48] *See* (Def.'s Rep. Mem. in Supp. Mot. for Summ. J., 53–55) (Dkt. No. 115).
[49] 272 F.3d 1136, 1143 (9th Cir. 2001).
[50] *Id.*
[51] *Id.*
[52] *See* 885 F. Supp. 1104 (W.D. Tenn. 1995).
[53] *Id.* at 1105-06.

was there an initial preference for this particular candidate, but there was also evidence that a number of different statements were made by various members of management that showed at least some hostility toward "older" individuals.[54] Such is seriously at odds with the facts of the instant case. There is no evidence that can reasonably suggest that the requirements were "skewed" in favor of Mr. Hager. Rather, after the requirements were broadened to garner a greater pool of candidates, only then did Mr. Hager's supervisor encourage him to apply.[55] Additionally, there is no evidence that the Agency broke any rules or regulations in reposting the job with amended qualifications. To the contrary, the evidence suggests that doing so was done in conformity with established procedures.[56] Lastly, as previously pointed out, there is no evidence that there was any hostility to any individuals on account of their age or gender.

Apart from using inapposite case law, Ms. Conroy has presented nothing that demonstrates that inconsistencies in the process were used to discriminate against her due to either her gender or age.[57] Without more, this court will not adopt an interpretation of the law which would prove to be a *de facto* prohibition on employers from ever reconsidering or rearticulating qualifications for an employment position out of fear that it could be construed to open them to litigation simply for "disadvantaging" someone. Accordingly, this argument fails.

### 2. Subjective Selection Process

Ms. Conroy's second argument is that the Agency used very subjective criteria to evaluate the candidates.[58] More specifically, Ms. Conroy asserts that the process "was subjective and unstructured, and the testimony of those involved in the process is fraught with contradictions

---

[54] *Id.* at 1107.
[55] (Pl.'s Mem. Opp'n to Mot. for Summ. J., 5) (Dkt. No. 105).
[56] Declaration of Larry Larson, ¶ 17 (Dkt. No. 76-2, Ex. B).
[57] Although statistics may be presented that demonstrate the employer's policy and practice regarding minority employment, it is but one of multiple factors that should be considered. *See Garrett v. Hewlett-Packard Co.*, 205 F.3d 1210, 1217 (10th Cir. 2002). The court finds this evidence to be non-persuasive.
[58] (Pl.'s Mem. Opp'n to Mot. for Summ. J., 3).

sufficient to find pretext."[59]  However, as an initial matter, Ms. Conroy misrepresents the law.[60]

The court will certainly view "with skepticism subjective evaluation methods," but such subjective

evaluation methods are "not wrongful per se."[61]  In *Garrett v. Hewlett-Packard Co.*, the court

considered a litany of activities that evidenced discrimination, including demotions, transfers, and

the resulting hostility from the plaintiff's participation in various internal diversity programs.[62]

Within this context, the court considered the concession by a division manager that the ranking

and evaluation system was wholly subjective, and ultimately concluded that no set of objective

criteria was offered into evidence.[63]

In contrast, there is no evidence in this case that Ms. Conroy was demoted, transferred, or

was treated with hostility for her involvement in protected actions.[64]  Rather, she simply argues

that because the five criteria were set forth with no indication as to one or more being more

important that the others, and that the various evaluators relied on the criteria differently, the

evaluation procedure was thus subjective and flawed.[65]  Indeed, the Agency likely failed in

narrowing and better defining how these areas related and weighed against each other.  But as

described below, such failures are not persuasive.  Defendant has offered credible explanations

that counter Ms. Conroy's accusation that the process was subjective, which Ms. Conroy has in

turn failed to rebut.

---

[59] *Id.* at 6.
[60] 305 F.3d 1210, 1218 (10th Cir. 2002).
[61] *Id.* (internal citations omitted).
[62] *Id.* at 1214-1216.
[63] *Id.* at 1218
[64] *See infra*, The Retaliation Analysis, Section IV B.
[65] *See* (Pl.'s Mem. Opp'n to Mot. for Summ. J., 6) (Dkt. No. 105).

### i. Ms. Conroy's Qualifications

Ms. Conroy asserts that there was no question that she was more experienced than Mr. Hager.[66] Even if true, Ms. Conroy's burden is to demonstrate that she was "overwhelmingly" more qualified than Mr. Hager, which she has failed to carry.[67] Mr. Hager had served as a civil engineer on the Bridger-Teton National Forest and was responsible for the INFRA Travel Routes/Deferred Maintenance data collection program, among other things.[68] He had project management experience and experience working on interdisciplinary teams at the Ranger District, National Forest, and Regional levels of the Forest Service.[69] Moreover, the single reference contacted for Mr. Hager, Mr. Williams, stated that Mr. Hager "had the necessary communication skills" to perform the coordinator position.[70]

By comparison, Ms. Conroy cites to her experience as the INFRA Program Coordinator, claiming that she had worked with program managers, and includes the opinions of several individuals that she was more qualified than Mr. Hagar.[71] This evidence may satisfy the requirement that, viewed objectively, Ms. Conroy was qualified for the position. It does not, however, meet the requirement that she was so "overwhelming" more qualified than Mr. Hagar that his selection over her was driven by discrimination against her gender.[72] As such, the various statements disagreeing with the decision to hire Mr. Hager do not give rise to a material factual dispute.[73]

---

[66] *Id.* at 7.
[67] *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005).
[68] Application of Daniel J. Hager, 1 (Dkt. No. 76-6, Ex. T).
[69] *Id.*
[70] Aff. of Cary Williams, ¶ 6) (Dkt. No. 76-6, Ex. V).
[71] (Pl.'s Opp'n Def.'s Mot. Summ. J. 12-14.)
[72] The court notes that even if Ms. Conroy could objectively show that she was, indeed, more qualified than Mr. Hagar, her claim would fail unless she could provide evidence that could show that her comparative qualification was "overwhelming." *See Santana v. Denver*, 488 F.3d 860, 865 (10th Cir. 2007).
[73] *See Santana v. Denver*, 488 F.3d 860, 865 (10th Cir. 2007) (holding that a plaintiff must show an overwhelming difference between her qualifications and those of a successful applicants in order to prove that she was better qualified).

ii.    Ms. Conroy's References

Ms. Conroy also argues that not one of her four listed references was contacted during the evaluation process.[74] This claim, even if meaningful, simply distorts the evidence. First, the evidence suggests that an attempt was made to contact Tah Yang. Ms. Brackmann has testified that after failing several times, she offered a positive recommendation in his place.[75] Second, Ms. Brackmann testified that she did not contact Mr. Coffman because she didn't have a phone number.[76] Third, it is true that Ms. Brackmann did not contact Ms. Hoskins, but stated that it was because she generally feels that soliciting opinions from references with particularly friendly relationships with a candidate is unhelpful.[77] Lastly, Ms. Brackmann did not testify whether or not she was able to contact Ms. Freeman, but rather that she couldn't remember.[78] The reference of Ms. Conroy that *was* contacted was Ms. Elizabeth Close, who had commented that Ms. Conroy had not exhibited strong leadership skills as a member of the recreation department's staff.[79] This opinion was echoed by Ms. Hanan,[80] who felt that Ms. Conroy had not exhibited strong leadership skills in her service as Regional INFRA coordinator.[81] None of the evidence suggests that a lack of interest or effort was either present, or resulted in a discriminating result. And

---

[74] (Pl.'s Mem. Opp'n to Mot. for Summ. J., 11) (Dkt. No. 105). It is worth noting that Ms. Conroy's briefing references Dr. Dodd's Report multiple times to refer to the various depositions in the record. *See id. at* 11–12. The Dodd Report does not speak for the individuals deposed, and it is not appropriate for counsel to leave it to the court to chase a paper-trail in order to evaluate the evidence.

[75] Dep. of Mary Jean Brackmann, 33–34 (Dkt. No. 76-5, Ex. N). Ms. Conroy states that Mr. Yang was available to be contacted through various means. However, nothing suggests that it could not have been difficult to contact someone who believes he has made himself available. Indeed, there is no legal standard that an employer must make so many attempts in each of several methods of communication to contact a reference. Without a bolder allegation that Ms. Brackmann is lying, there is no reason to believe that she did not actually make a reasonable effort to contact Mr. Yang.

[76] *Id.* at 34-35.

[77] *Id.*

[78] *Id.* at 35.

[79] *Id.* at 46; Aff. of Elizabeth G. Close, ¶ 6 (Dkt. No. 76-4, Ex. H).

[80] Ms. Hanan served on the review panel that made a recommendation to the selecting official, Mr. Pyron. As the Management Representative on the panel, she was to provide a perspective of Regional Leadership in terms of what was wanted out of the position. Aff. of Tamara L. Hanan, ¶ 2 (Dkt. No. 76-4, Ex. L-4).

[81] Dep. of Tamara L. Hanan, 142–47 (Dkt. No. 76-4, Ex. L); Aff. of Tamara L. Hanan, ¶ 6 (Dkt. No. 76-4, Ex. L-4).

nothing supports the notion that the reference process was conducted in a subjective manner, or used to perpetuate a subjective evaluation in order to achieve a discriminatory intent.[82]

It is worth reiterating that the burden rests on Ms. Conroy to show that the proffered legitimate reasons were pre-textual.[83]  Taking Ms. Conroy's assertions as true, the court can only determine that there may have been some inconsistencies, irregularities, or contradictions in the evidence.  Ms. Conroy has shown that the Agency's processes were at times subjective and poorly defined, but nothing demonstrates pretext for intentional discrimination.  There is no history of discrimination or other evidence that supports her contentions, and no testimony has been presented from the various women whom have been deposed that Ms. Conroy was discriminated against on account of her age or gender.  Nothing in the evaluation process suggests that there had been untoward action taken against Ms. Conroy in the past, or that the evaluation and hiring process was used to perpetuate discrimination against her on account of her gender, age, or otherwise.[84]  Ms. Conroy has failed to establish that a reasonable jury could find that the Agency's proffered legitimate reasons are "unworthy of belief."[85]  Accordingly, her contention fails.

---

[82] While a member of a particular gender can certainly discriminate against other members of that gender, there is weight in the fact that Ms. Conroy is asserting that the individual involved in the reference checking – Ms. Brackmann – was part of the discriminatory process.  Without more evidence of Ms. Brackmann's animus toward other women in the workplace, this assertion is simply untenable.

[83] *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.")

[84] It must be noted that such a pattern of discrimination is not necessarily required.  Indeed, discrimination can be found in a single, isolated instance.  However, void of such patterns of past discriminatory behavior, the simple skepticism conjured by such subjectivity does not substitute for the evidence needed to sustain the claim.  Indeed, nothing in the evidence before the court demonstrates either a discriminatory purpose or a discriminatory effect stemming from the subjective evaluation methods used by the Agency.

[85] *See Piercy v. Maketa*, 480 F.3d 1192,1200 (10th Cir. 2007) (internal citation omitted).

## IV.     MS. CONROY'S 2004 DISCRIMINATION AND RETALIATION CLAIMS

### A. <u>Discrimination</u>

Ms. Conroy likewise alleges that the 2004 position, though substantially the same as the 2001 position, was posted in the professional rather than administrative series in order to require more experience and qualifications, by which the Agency could knowingly and purposefully discriminate against her on account of her gender.[86]  The only novel issue to be determined here is whether the different posting was done to purposefully discriminate against Ms. Conroy on account of her gender, as alleged.  The record indicates that the only material difference between the 2001 and 2004 positions was that the 2004 position was not *also* posted in the administrative series.[87]  The record also evidences that this change was due to an Agency policy prohibiting such a duel listing, and that the decision was made to list it in the professional series alone.[88]  The court cannot find this reclassification as anything less than legitimate, and Ms. Conroy has failed to demonstrate that it was pre-textual.  There is no evidence that the listing was meant to discriminate against any woman on account of her gender, including Ms. Conroy.  Indeed, the fact that the position was ultimately given to Ms. Andrea Gehrke severely cuts against Ms. Conroy's claim.[89]  Ms. Conroy's contention is rejected.

### B. <u>Retaliation</u>

The final issue before the court is whether the listing change for the 2004 position was done in retaliation of Ms. Conroy's previous complaint.  The Tenth Circuit has found that in order to meet the prima facie case for retaliation, a plaintiff must show that she (1) engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the

---

[86] (Am. Compl., ¶ 43) (Dkt. No. 3).
[87] *See* (Def.'s Mem. Supp. of Mot. for Summ. J., 36–37) (Dkt. No. 76).
[88] (Def.'s Rep. Mem. in Supp. Mot. to Exclude, 22) (Dkt. No. 124).
[89] Dec. of Stephen Solem, ¶ 14 (Dkt. No. 76-2, Ex. A).

materially adverse action.[90]  In this case, the Defendant *does* dispute that Ms. Conroy has

established a prima facie case of retaliation asserting that she cannot demonstrate a causal

connection between her protected activity and the materially adverse action.[91]  The Tenth Circuit

has stated that this prong can be inferred if the actions occur within a short period of time.[92]  But,

because the timing in this case between Ms. Conroy's first complaint and the second job posting is

substantially longer than case law permits for such an inference,[93] Ms. Conroy must offer

additional evidence to establish causation.[94]

  Ms. Conroy's additional information can be grouped into two categories: (1) that others

were aware of her protected opposition to discrimination, and (2) that the job was posted with

unnecessary requirements in that it did not require a degree in any field.  The evidence supporting

the first point can be assumed.  Clearly, others were aware of her protected opposition.  But the

court cannot conclude from the evidence on the record that this caused the job listing change.  Ms.

Conroy does not dispute that the nationwide Forest Service policy precluded advertising jobs as

"interchangeable" in 2004.  She suggests, rather, that it was the policy beginning in 2001 but was

ignored until she showed interest in 2004.[95]  This is unpersuasive.

  Assuming that the job itself did not require a degree does not show purposeful retaliation

against Ms. Conroy.  It is undisputed that the Agency faced the need of coming into compliance

---

[90] *McGowan v. Eufala,* 472 F.3d 736, 741 (10th Cir. 2006).
[91] (Def.'s Mem. Supp. of Mot. for Summ. J., 34).
[92] *Id.* at 744.
[93] *Proctor v. United Parcel Service*, 502 F.3d 1200, 1208 (holding that a four month window is too large of a time gap to establish a causal connection). Ms. Conroy fails to provide case law that supports her notion that the time for such retaliation began when she showed interest in the position, rather than at the time of her protected action.  (Pl.'s Mem. Opp'n to Mot. for Summ. J., 20) (Dkt. No. 105).
[94] *See O'Neal v. Ferguson Constr Co.*, 237 F.3d 1248, 1253 (10th Cir. 2011) ("Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."); *Piercy v. Maketa*, 480 F.3d 1192,1198 (10th Cir. 2007) (stating that "unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation.) (emphasis in original) (internal quotation omitted).
[95] (Pl.'s Mem. Opp'n to Mot. for Summ. J., xxi–xxii).

with how jobs were to be posted.  Regardless of what had happened in the past, the decision was

made to require formal education rather than not.  Mr. Solem testified:

> By 2004, after two years of experience with the INFRA Program Manager position, management had a better understanding of the duties and necessary qualifications for the position.  It was my view and the view of other management officials that the focus of the position was not system management, which requires technical skills . . . but data management, which requires professional knowledge and field experience in the various subject-matters relating to the Forest Service mission . . . .  [Thus, given] the restriction on interchangeable positions, and because the INFRA Program Manager position had continued to develop into a position requiring more analysis and interpretation of data for the benefit of management, we determined that the position would be advertised in the professional series as opposed to the administrative series.[96]

Mr. Fuller's testimony similarly states,

> What we wanted [the candidates] to have was data management skills in terms of understanding what the data is used for, how it might be applied to better performance of work processes out there on the forest, and so what we're really saying is they wanted to deal with data management, not systems management, and since the users of this data were primarily professionals in various functional areas, such as engineers, then they wanted . . . the incumbent to have a good understanding of what the data means, how it's used, so that they could better assist the user in seeing how they can best utilize the system to do their work.[97]

The evidence before the court establishes that the purpose of relisting the position only in

the professional series was due to Agency policy which prohibited an interchangeable listing, and

that choosing the professional rather than the administrative series was to further the development

of the position and was based on previous templates used in other regions.  The record evidences

that the listing was consistent with other regions that had advertised positions similar to Region

4's INFRA Program Manager position in the professional series.[98]  Ms. Conroy has offered no

direct evidence of retaliatory animus or threat.[99]  Neither has she proffered circumstantial

evidence, such as name calling or other hostile remarks to suggest that there was any sort of

---

[96] Dec. of Stephen Solem, ¶¶ 12–13 (Dkt. No. 76-2, Ex. A).
[97] Dep. of Donald G. Fullmer, 62 (Dkt. No. 76-4, Ex. K).
[98] *See* Dep. of Laura Conroy, 217–220 (Docket No. 76-3, Ex. D).
[99] *See Bergene v. Salt River Project Agricultural Improvement & Power District*, 272 F.3d 1136, 1141 (finding retaliation where the supervisor threatened that the plaintiff would not be promoted if she "held out for too much money in settling an earlier pregnancy discrimination claim.").

retaliation action being taken against her.[100]  Ms. Conroy has offered nothing but mere speculation and attenuated conjecture that suggests that the reclassification had anything to do with her.  To the contrary, the record is replete with testimony that articulates not only the decisions surrounding the second reposting, but the broader Agency concerns that made the repositioning important.  Accordingly, Ms. Conroy's evidence does not support her assertions.  The court therefore finds that Ms. Conroy has failed to establish her prima facie case for retaliation because she cannot show causation by a preponderance of the evidence.

Even if Ms. Conroy had established a prima facie case, the Government may rebut it by showing a legitimate non-discriminatory reason for the adverse action.  In such an instance, Ms. Conroy would then have the burden to show that the proffered reason is but pretext for masking the retaliatory animus.[101]  Ms. Conroy may establish pretext "by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [in] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[102]

There is little need to re-articulate the Government's non-discriminatory reasons for the alleged adverse action, which are previously set-forth.  In attempting to rebut the reason, Ms. Conroy first argues that Steve Solem failed to originally state in his deposition that the reclassification was made because the "INFRA Program Manager needed to be able to understand what the data being entered meant."[103]  This argument is unavailing.  There is no reason to believe that such an omission creates an inconsistent story.  But more importantly, there is no inconsistency in light of the Selection Meeting Narrative of 2004, which states that "[p]riority

---

[100] *See id.* at 1142 (explaining that circumstantial evidence can create a pretext of retaliation).
[101] *See Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007).
[102] *Santana v. Denver*, 488 F.3d 860, 865 (10th Cir. 2007).
[103] (Pl.'s Mem. Opp'n to Mot. for Summ. J., 23.)

work for this position . . . is to deal with data management not system management."[104]  Second, Ms. Conroy contends that the proffered reasons are, in her judgment, "weak."  Weak or not, the standard is whether "a reasonable factfinder could rationally find them unworthy of credence."[105] Ms. Conroy has failed to meet that burden.  Lastly, Ms. Conroy offers nothing more than conclusory conjecture to show that the changes in the position requirements were simply directed at her.[106]  Again, Ms. Conroy has provided neither evidence nor argument sufficient to show that the Government's proffered reasons were "unworthy of credence."  Accordingly, Ms. Conroy's claim of retaliation fails.

## CONCLUSION

At its roots, this case is a mere embodiment of Ms. Conroy's dissatisfaction that she didn't get a job she thought she deserved.  As her complaint states, "Defendant discriminated against Plaintiff, because she was much better qualified for the position than Hager was."[107]  Clearly, the law does not recognize such a claim; and so, Ms. Conroy has attempted to cobble together a complaint that has at times embellished the facts and strained the law.

Indeed, Ms. Conroy has made a good case that the Agency's hiring policies may need a review to assure that the best candidates do not fall through the cracks.  But the evidence does not suggest, nor does it make an issue of material fact, that the evaluation process was ever a ruse to carry out or justify discrimination.  Subjectivism certainly may raise skepticism in the discrimination context, but more must be submitted than has been offered.  Ms. Conroy has ultimately failed to carry her burden and bring forth either evidence or argument that is able to consummate the inherent skepticism of subjectivity and create an actionable claim.

---

[104] (Def.'s Mot. for Summ. J., Ex. Z.)
[105] *Santana*, 488 F.3d at 865.
[106] (Pl.'s Mem. Opp'n to Mot. for Summ. J., 24.)
[107] (Am. Compl., ¶ 25.)

Although the court's duty is to apply the facts of the case to the law, it is worthwhile to briefly note the implications of this action. If successful, Ms. Conroy would require employers to divorce themselves from all subjective judgments in the employment evaluation process on threat of litigation. Such is simply an impractical standard. The burden is on the plaintiff to establish the prima facie case, and to show that the legitimate reasons proffered by a defendant are pre-textual. To find this burden met through simple skepticism would turn the court into nothing more than "a super personnel department . . . second [guessing] employers' business judgments."[108] This court will not assume such a role.

Therefore, and for the foregoing reasons, Defendant's motion to exclude[109] and motion for summary judgment[110] are GRANTED.

DATED this 7th day of March, 2011.

BY THE COURT:

Clark Waddoups
United States District Court Judge

---

[108] *Simms v. Oklahoma ex rel Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999).
[109] (Dkt. No. 116.)
[110] (Dkt. No. 75.)